UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LaSHAWNDA M. SMITH,

    Plaintiff,

vs.                                        CIVIL NO. 2:07-CV-12546

MICHAEL J. ASTRUE,                 DISTRICT JUDGE MARIANNE O. BATTANI
COMMISSIONER OF SOCIAL SECURITY,    MAGISTRATE JUDGE STEVEN D. PEPE

    Defendant.
_____/

**REPORT AND RECOMMENDATION**

**I.    BACKGROUND**

LaShawnda M. Smith brought this action under 42 U.S.C. § 405(g) for judicial review of the Commissioner's final decision that Plaintiff was not entitled to Disability Insurance Benefits (DIB) under Title II of the Social Security Act as of October 30, 2002. Both parties have filed motions for Summary Judgment, which have been referred pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the following reasons, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and Defendant's Motion for Summary Judgment be **GRANTED**.

    **A.    Procedural History**

On September 9, 2003, Plaintiff applied for DIB alleging disability since October 30, 2002, based on ailments including pain to her right foot due to a fracture (R. 63). After Plaintiff's claim was denied upon initial review, an administrative hearing was held on June 5, 2006, before Administrative Law Judge (ALJ) Bennett Engelman, at which Plaintiff was

1

represented by attorney Peter B. Bundarin (R. 309-25). Vocational Expert (VE) Michelle Robb also testified. On July 17, 2006, ALJ Engelman decided Plaintiff was not disabled from October 30, 2002 through June 30, 2005 the last date of her insured status, because despite her impairments, she could perform a limited but significant number of sedentary jobs identified by the vocational expert Robb (R. 38). This became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review (R. 5-7).

### B. **Background Facts**

#### 1. *Plaintiff's Testimony and Statements*

Plaintiff was 28 years old at the time of her alleged onset of disability (R. 33). Plaintiff has a high school education with a G.E.D. and has worked as a fast food manager, store clerk, fast food worker, dietary aide and cashier (R. 64, 69, 75-81). During the time of her disability she was able to continue her studies in a medical assistance program finishing the course work and externship at her own pace (R. 312-13). She felt that she would not be able to work as a medical assistant because of the sitting/standing demands of the job (R. 313). Moreover, Plaintiff testified that she was no longer able to work in any capacity because of foot and back pain (R. 316).

At the hearing, Plaintiff described her daily activities during the relevant period (R. 315 and 318). She testified that she lives with her five children who range in age from eight to thirteen (R. 315). When the children are in school, she lies down for most of the day. Her girls do most of the cleaning and preparing of simple meals. Plaintiff got her children ready for school, played with them, prepared simple meals, did a little cleaning and laundry, went grocery shopping, and attended to household needs (R. 84-87). She noted that she can no longer play

with her children in the way she could before her injury like running around and going to the parks (R. 87). Plaintiff occasionally drives a car, though usually the children's father drives her places such as to the grocery store. (R. 318).

Plaintiff described her pain to be constant and sharp estimating her back pain–on a range of zero to ten, zero being no pain and ten being the worst pain she ever experienced–to be about a six and the foot pain at a seven or eight (R. 317). Usage of Vicodin and Ibuprofen three times a day alleviates the pain somewhat though makes her drowsy, and Pamelor helps her to rest at night. (R. 317 and 320-21). She also testified that in the six months leading up to the hearing, her pain worsened (R. 319). Her nurse practioner, who she sees monthly, referred her to a specialist because of the problem. Unfortunately, Plaintiff was not able to get to physical therapy or see a specialist because of difficulties with Medicaid not approving the service (R. 319).

Plaintiff injured her foot while working at McDonald's and a Worker's Compensation case ensued (R. 314). A settlement was reached relieving McDonald's of any continuing obligations to Plaintiff (R. 314).

### 2. *Medical Evidence*

On October 29, 2002, Plaintiff slipped and fell, injuring her left knee and right ankle (R. 100-01). Plaintiff sought care at the emergency room treatment and was released with a diagnosis of right ankle sprain and left knee contusion (R. 101). Right ankle x-rays revealed no fractures or dislocations (R. 102).

Plaintiff returned to the emergency room on November 1, 2002, because the pain continued (R. 98). Again, x-rays to the right foot showed no fracture or dislocation (R. 99).

Three days later, she returned to the emergency room because of the pain to her right foot. Merle Hunter, M.D. diagnosed a contusion to the right foot and left knee strain and applied a splint (R. 95-96). Dr. Hunter called Plaintiff's supervisor at McDonald's recommending that Plaintiff could return to work so long as she would be sitting for the duration of the shift (R. 95). The doctor advised Plaintiff to return to his office on November 13, 2002.

On November 12, 2002, Plaintiff went to the emergency room because of right foot pain (R. 113-14). A CT scan of the right foot was performed and then interpreted by David E. Baker, M.D. (R. 103-04). Dr. Baker found a bony fragment that could be either an accessory ossicle or an ununited fracture (R. 103). Plaintiff was given Vicodin to help ease the pain and instructions to keep her foot elevated (R. 116).

On December 3, 2002, Plaintiff again returned to the emergency room because of right foot pain (R. 109). Plaintiff was again given Vicodin and also Motrin for her pain with instructions to follow-up with an orthopedist within one week (R. 112).

December 6, 2002, Plaintiff followed-up with Adrienne A. Spirt, M.D., PhD, at Community Orthopedic Surgery (R. 130). Dr. Spirt found there to be minimal edema in the right foot fracture area, the skin was intact and in good condition, the overall alignment of the foot was normal, and there were no motor or sensory deficits (R. 130). Dr. Spirt recommended another few weeks of the cast, informed Plaintiff that smoking could slow down the healing process and concluded Plaintiff that could perform sedentary work (R. 130-31). Dr. Spirt continued to see Plaintiff from December 30, 2002, to May 20, 2004 (R. 126-29). Plaintiff reported continued pain with her foot so a CT scan was performed to rule out a delayed union/nonunion, a condition to which Plaintiff was at risk because of the smoking (R. 127). The

4

March 4, 2003, CT scan like the November 13, 2002, CT scan, showed a bony fragment that could be an ununited fracture (R. 126, 103-04).

On March 15, 2003, Plaintiff went to the emergency room because of low back pain (R. 105-08). Plaintiff was instructed to treat with ice or mild heat and to see Dr. Spirt within three to four days (R. 108).

On April 10, 2003, Plaintiff was seen by Dr. Spirt (R. 123). Plaintiff reported tenderness to palpitation to the foot, accordingly, Dr. Spirit advised an excision of the fracture fragment (R. 123).

On April 22, 2003, Plaintiff underwent open reduction and internal fixation of the calcaneus fracture nonunion with tibial bone grafting (R. 117).

In May and June 2003, Dr. Spirt found minimal edema, and reported that x-rays showed bony consolidation at the fracture site (R. 120-21). Plaintiff told the physician she was doing well (R. 120-21).

On July 10, 2003, Plaintiff returned to Dr. Spirt because of right foot pain (R. 119). The doctor found no color or temperature change, hyperhidrosis or light touch sensory deficits (R. 119). Right foot x-rays showed 75% consolidation of the nonunion site with the distal portion of the fracture not fully consolidated (R. 119). Dr. Spirt recommended weight-bearing as tolerated concluding that there was no visible evidence of reflex sympathetic dystrophy (R. 119).

Plaintiff underwent hardware removal from the right ankle on November 11, 2003 (R. 188). On November 13 and December 1, 2003, Dr. Spirt reported Plaintiff's pain was markedly decreased after removal of the screw, and that a CT scan showed partial union with some healing compared to her prior CT scan (R.186-87).

On December 11, 2003, Plaintiff had x-rays taken of her right foot that were interpreted by Surender Kurapati, M.D. (R. 165). Dr. Kurapati concluded that the x-rays showed no destructive or traumatic skeletal pathology in the right foot, and only minor degenerative changes (R. 165).

On December 16, 2003, at the request of the state agency, S. L. Schuchter examined Plaintiff (R. 163-64). During the physical examination, Dr. Schuchter observed that Plaintiff walked with a limp, with and without a crutch or a boot on the right foot, could not walk on her heels or toes and could not squat (R. 164). The doctor noted, however, that Plaintiff had no difficulty getting on and off the examining table (R. 164). Right ankle jerk was diminished, reflexes at the ankles were normal, sensation was intact, and there was some swelling of the right foot (R. 164).

A state agency physician, Robin Mika, D.O., reviewed plaintiff's medical record on January 6, 2004 to assess Plaintiff's ability to work (R. 169-76). Plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently, stand/walk 2 hours a day, and sit 6 hours a day (R. 170). Plaintiff had a limited ability to push/pull in the right lower extremity, could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl, and never climb ropes or ladders (R. 170-71). Further, Dr. Mika stated Plaintiff should avoid concentrated exposure to machinery and all exposure to heights (R. 173). Dr. Mika found Plaintiff's reports of her daily limitations to be partially credible (R. 174).

On January 12, 2004, Dr. Spirt examined Plaintiff again finding there be minimal edema at the right foot with skin intact and in good condition and normal motion of the toes and ankle (R. 185). Right foot x-rays showed bony consolidation at the fracture site (R. 185).

On February 27, 2004, Plaintiff underwent a CT scan of the right foot (R. 183). The results showed progressive healing of the fracture, and findings compatible with diffuse osteopenia or reflex sympathetic dystrophy (R. 183-84).

On March 1, 2004, Dr. Spirt again evaluated Plaintiff's right foot, finding good motion of the foot and toes, and no extreme discomfort to light touch (R. 182). Dr. Spirt thought reflex sympathetic dystrophy was playing a fairly significant role in Plaintiff's symptoms (R. 182).

On May 6, 2004, Plaintiff underwent a right lumbar sympathetic block because of right foot complex regional pain syndrome (R. 192).

Plaintiff returned to see Dr. Spirt on May 20, 2004 (R. 179). Dr. Spirt reported that the most recent CT scan showed partial union of the fracture (R. 179).

On May 25, 2004, Yun Wang, M.D., saw Plaintiff for a follow-up after the sympathetic block (R. 190-91). Dr. Wang noted a slightly decreased strength in the right foot with normal sensation, concluding that Plaintiff responded to the block (R. 190).

On June 8, 2004, Plaintiff underwent a second right lumbar sympathetic block (R. 224). James R. Holmes, M.D., examined Plaintiff on June 17, 2004, for a follow-up appointment (R. 222). Plaintiff's foot was dark and discolored, her right toes were cooler, and she had abnormal sensation (R. 222). X-rays showed no abnormality (R. 221-22). Dr. Holmes stated that the findings strongly suggested chronic regional pain syndrome (R. 222).

On July 2, 2004, Jeffrey T. Bucholz, D.O., and Srinivas Chiravuri, M.D., examined Plaintiff (R. 219). The doctors found there to be moderate allodynia and hyperesthesia in a

nondermatomal fashion in the right foot (R. 219).[1]

On July 15, 2004, Dr. Holmes noted recent CT scan showed no abnormality that would be causing her discomfort, specifically no fracture, dislocations or loose bodies (R. 217). Dr. Holmes found there to be osteopenia, a precursor to osteoporosis (R. 216).

On August 27, 2004, Plaintiff underwent a right lumbar sympathetic block to help with her back pain (R. 210). Anthony Chiodo, M.D., examined Plaintiff on September 17, 2004 (R. 208). Sensation in the right ankle was intact (R. 208-09). Dr. Chiodo recommended outpatient physical therapy for her back, shoulder and thigh pain (R. 209).

On September 24, 2004, Dr. S. Chiravuri examined Plaintiff concluding that further lumbar sympathetic blocks would not be beneficial, instead Plaintiff should go to physical therapy (R. 206). Dr. Chiravuri noted that Plaintiff tried physical therapy earlier but did not follow through with the program because of pain (R. 206). He noted her allodynia pain symptom was imroved (R. 207).

November 8, 2004, physical therapy intake noted that Plaintiff walked here children to and from school with back pain (R. 203). On January 21, 2005, Plaintiff stated she felt better, and the therapist observed she moved more easily (R. 201). The therapist also noted that Plaintiff missed six of her eleven therapy appointments and noted that consistent therapy was related to reduction of pain (R. 202).

On March 7, 2005, Megan Eagle, a family nurse practitioner completed a medical

---

[1] Allodynia is a painful response to a usually non-painful stimulus. Similarly, Hyperesthesia is a condition that involves an abnormal increase in sensitivity to stimuli of the senses.

examination report for the Michigan Family Independence Agency. She opined that the Plaintiff's condition was stable and improving with treatment (R. 233) She limited Plaintiff's ability to work to occasionally lift up to 10 pounds, walk one hour, do no standing, never operate foot controls and sitting for a maximum of 4 hours (R. 233).

On January 20, 2006, Nurse Eagle completed a physical capacities evaluation. Nurse Eagle, again opined about Plaintiff's ability to work limiting her to sitting for no more than 3 hours, but not continuously, standing for one hour, and walking one hour (R. 297). Further, Plaintiff was to lie down at unpredictable times, could occasionally lift up to 20 pounds and carry up to 10 pounds (R. 298). Plaintiff could perform sedentary work with frequent breaks to stand/walk/rest, but could not work more than 4-6 hours a day (R. 301).

3.  *Vocational Evidence*

VE Robb described Plaintiff's past work to range in exertional level from light to medium and skill level from unskilled to semi-skilled (R. 265).

ALJ Engelman posed the following hypothetical to VE Robb – assume an individual of the same age, education, and work experience as the Plaintiff, with the following limitations: the individual can lift up to 20 pounds occasionally and 10 frequently; she is limited to sedentary work with occasional standing (R. 322)

VE Robb stated that she believed that such an individual could perform work as a receptionist or information clerk, general office clerk, and office clerk (R. 322). Approximately 28,800 such jobs exist in the lower two-thirds of Michigan (Tr. 322)

ALJ Engelman modified the hypothetical question incorporating Plaintiff's reported limitations requiring such an individual to lay down for an unpredictable amount of time or an

9

individual who took medication that made them drowsy so that their cognition or ability to stay focused was significantly impaired (R. 323). VE Robb believed that such a worker would be eliminated from full-time competitive employment (R. 323).

### 4. *ALJ Engelman's Decision*

ALJ Engelman found that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2005, and that she had not engaged in substantial gainful activity since her alleged onset date of October 30, 2002 (R. 31). He found that Plaintiff's status post fracture of the right foot, complex regional pain syndrome, and degenerative disease of the lumbar spine were "severe" impairments within the meaning of the Regulations, but not "severe" enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, or Regulations No. 4 (R. 33).

ALJ Engelman found that Plaintiff retained the RFC to perform a significant range of sedentary work activity that allows for alternating between sitting and standing positions at will, lifting of up to 10 pounds, sitting for more than six hours and walking and standing for more than two hours in an eight-hour work day (R. 39). Considering Plaintiff's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that the Plaintiff could perform (R. 38).

The ALJ found that Plaintiff's allegations regarding her pain and functional limitations were not totally credible (R. 37). The ALJ found her estimation of pain and limitations to be inconsistent with the objective medical evidence provided by the treating physicians (R. 37).

## II. ANALYSIS

In his motion for summary judgment, Plaintiff argued that (1) ALJ Engelman improperly

assessed Plaintiff's credibility, limitations and complaints of pain; (2) ALJ Engelman improperly assessed the Plaintiff's Residual Functional Capacity ("RFC"); and (3) The Commissioner's decision was not supported by substantial evidence (Dkt. # 9).

### A. Standards of Review

Plaintiff must establish that she became disabled under Title II of the Act prior to June 30, 2005, the date her insured status expired. *See* 42 U.S.C. § 416(I); 20 C.F.R. §§ 404.131(a), 404.320(b)(2)*; Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment(s) must be of such severity that the individual can neither do her previous work nor engage in any other kind of substantial gainful work which exists in the national economy, considering her age, education, and work experience. *See id.* § 423(d)(2)(A).

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a

11

different conclusion. *Mullen v. Brown*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)). The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. *Id*. If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm. *Studaway v. Secretary of HHS*, 815 F.2d 1074, 1076 (6th Cir. 1987); *Kirk v. Secretary of HHS*, 667 F.2d 524, 535 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). In determining the existence of substantial evidence, it is not the function of a federal court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry the burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects. A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform. *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs*., 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v.*

*Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

### B. Factual Analysis

### 1. Plaintiff's Credibility at Issue

Plaintiff challenges the Commissioner's decision arguing that the ALJ's credibility finding is not supported by the record because it fails to adequately assess Plaintiff's subjective estimation of her pain and limitations due to foot and back pain. Subjective evidence is only considered to "the extent [it] can reasonably be accepted as consistent with the objective medical evidence and other evidence" (20 C.F.R. 404.1529(a)) (*See Young v. Secretary of Health & Human Servs.,* 925 F.2d 146, 150-51 (6th Cir. 1990); *Duncan v. Secretary,* 801 F.2d 847, 852 (6th Cir. 1986) (Subjective complaints of a claimant can support a claim for disability, if there is also objective medical evidence of an underlying medical condition in the record that would explain such pain). The issue of a claimant's credibility regarding subjective complaints is largely within the scope of the ALJ's fact finding discretion – the Commissioner's "zone of choice" – if adequately explained and supported by the record.

The ALJ is not required to accept a claimant's own testimony regarding allegations of disabling pain when such testimony is not supported by the record. *See Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987). The ALJ must, however, do more than say the testimony is not credible based on generalities or merely recount the medical evidence and claimant's daily activities and then without analysis summarily conclude that the overall evidence does not contain the requisite clinical, diagnostic or laboratory findings to substantiate

13

the claimant's testimony regarding pain. *Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994). In order for an ALJ to properly discredit a claimant's subjective testimony, the credibility determination must be accompanied by a detailed statement explaining the ALJ's reasons. S.S.R. 96-7p directs that findings on credibility cannot be general and conclusory findings, but rather they must be specific.

ALJ Engelman states his reasons for discounting Plaintiff's credibility. As required by the regulations, he compared Plaintiff's testimony against the clinical and objective medical evidence, the location, duration, frequency and intensity of her pain, precipitating and aggravating factors, use of medications, treatment other than medications, other measures used to relieve pain and direct observations of the Plaintiff during the hearing (R. 33-37). Based on his comparison of her claims with the above mentioned factors, ALJ Engelman found Plaintiff's testimony not "entirely credible." (R. 37). He noted that despite alleging severe pain during the hearing there was no objective evidence or treatment notes from the Plaintiff's treating physician to support Plaintiff's allegation of severe pain that would account for the high degree of reported pain. Furthermore, treatment records provided through 2005 reveal that the Plaintiff's pain symptoms improved with conservative treatment after the November 11, 2003, surgery removing the screw initially used to fix the break (R. 34). Pain was significantly improved with the sharp pain gone one week after the surgery (R. 187). She asked for "lighter" pain medication. On December 1, 2003, plaintiff stated her pain was "markedly decreased" albeit with some "throbbing pain" about her foot (R. 186). A comparison CT scan showed partial union with some healing and no change in alignment. The December 11, 2003, x-ray study of the Plaintiff's right foot revealed no evidence of any significant destructive or traumatic pathology only minor

14

degenerative changes. A CT Scan of February 2004 showed increased bony consolidation at the fracture site, significant improvement from the November 26 CT scan (R. 182). Physical therapy for the ankle seemed to help and she was given an ankle support to replace the Cam Walker boot she no longer needed. She indicated "that she is still off work due to her inability to drive." Dr. Spirt believed that she still had reflex sympathetic dystrophy. A May 6, 2004, lumbar block provided 60-70% relief for 12 days for her right foot pain (R. 190). Plaintiff noted the block helped her do her home therapy. On May 20, 2004, she reported to Dr. Spirt the block provided "relief of all of her pain except the sharp stabbing pain."(R. 179). It appears her foot allodynia improved significantly in the summer of 2004 when she received physical therapy for her back, shoulder and thigh pain (R. 207). A physical examination of Plaintiff's back on September 17, 2004, indicated some decreased range of motion in her lumbar spine, but normal findings with regard to straight leg raises and standing stork and flexion testing (R. 35 referring to R. 209). Her pain was down form 5-6 of 10 to 3 of 10, although she was still taking 203 Vicodin ES a day. None of the physicians opined that the conditions severely limit Plaintiff. On January 21, 2005, Plaintiff stated she felt better after her course of physical therapy six even though she missed over half of the sessions(R. 201-02).

ALJ Engelman had substantial evidence to discredit Plaintiff's testimony. He had reasons not to rely on Nurse Eagles January 2006 conclusion that limited Plaintiff to 4-6 hours of work a day. ALJ Engelman found instead she could sit for up to 6 hours and stand or walk for up to 2 hours in a work day because the objective and clinical evidence on this matter demonstrated only a mild condition in terms of lower back pain and the right foot condition which had improved since her surgery (R. 36).

It is well established that the findings and opinions of treating physicians are entitled to substantial weight. Yet, Nurse Eagles is not a treating physician and is therefore not entitled to deference. Under the regulations, only "acceptable medical sources" are entitled to the deference accorded a treating physician. *See* 20 C.F.R. § 404.1527(a)(2). Nurse practitioners are not considered "acceptable medical sources." *See* 20 C.F.R. § 404.1513(d)(1). None of Plaintiff's treating physicians submitted a report on Plaintiff's residual functional capacity. Even if they had, the conclusion of whether a claimant is "disabled" is a decision reserved to the Commissioner to decide (R. 19). 20 C.F.R. §§ 404.1527(e)(1), (2), 416.927(e)(1), (2). And, "[w]e will not give any special significance to the source of an opinion on an issue reserved to the Commissioner." *Id*. at §§ 404.1527(e)(3), 416.927(e)(3).

Accordingly, the ALJ concluded that the record does not disclose any basis which would support a finding that Plaintiff has any significant limitation which would prevent her from performing sedentary work. Because ALJ Engelman properly discredited Plaintiff's testimony, Plaintiff's assertion that ALJ Engelman erred when he disregarded Plaintiff's subjective complaints of pain as a result of foot and back pain is without merit.

### 2. Plaintiff's Residual Functional Capacity

Plaintiff asserts that in determining that she could perform a significant number of jobs, the ALJ relied on a deficient hypothetical question to the VE because it suffered from an improper determination of Plaintiff's residual functional capacity (RFC). Contrary to Plaintiff's claim, the hypothetical questions the ALJ asked the VE, and the corresponding answers the ALJ relied on, were adequate because they included all of Plaintiff's substantiated impairments and resultant limitations. The ALJ may pose hypothetical questions to the VE which include only

16

those limitations which the ALJ finds credible. *Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993).

The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). To meet the burden of showing that Plaintiff could perform work that is available in the national economy, the Commissioner must make a finding "supported by substantial evidence that [he] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987). This kind of "[s]ubstantial evidence may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only 'if the question accurately portrays [his] individual physical and mental impairments.'" *Id.* (citations omitted).

For the reasons stated in the preceding section, ALJ Engelman had substantial evidence to reject the degree to which Plaintiff was limited by alleged pain and Nurse Eagle's medical opinion on her durational capabilities.

Therefore, ALJ Engelman in his questions to VE Robb adequately described Plaintiff's physical condition. The ALJ proffered a hypothetical individual of the same age, education, and work experience as the Plaintiff, who was limited to sedentary work with occasional standing, frequently lifting ten pounds and occasionally lifting twenty pounds (R. 322)

VE Robb testified that such an individual with those limitations could perform jobs as a receptionist or information clerk, general office clerk, and office clerk (R. 322). Approximately 28,800 such jobs exist in the lower two-thirds of Michigan (R. 322).

Based on the testimony of VE Robb, a reasonable ALJ could conclude that there existed

17

sufficient jobs which Plaintiff could perform even though she could not engage in any of her past relevant work. Therefore, **IT IS RECOMMENDED** that ALJ Engelman's RFC finding not be overturned.

### III. RECOMMENDATION

For the reasons stated above there is substantial evidence supporting ALJ Engelman's decision. **IT IS RECOMMENDED** that Defendant's Motion for Summary Judgment be **GRANTED** and that Plaintiff's Motion for Summary Judgment be **DENIED**. Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten days of service of a copy hereof as provided for in 28 U.S.C. section 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981), *Thomas v. Arn*, 474 U.S. 140 (1985), *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987), *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objection must be served upon this Magistrate Judge.

*Note:* any objections must be labeled as "Objection #1," "Objection #2," etc.; any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than ten days after service an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as

"Response to Objection #1," "Response to Objection #2," etc.

Dated: April 30, 2008                                                       s/Steven D. Pepe
Ann Arbor, Michigan                                                United States Magistrate Judge

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing ***Report and Recommendation*** was served on the attorneys and/or parties of record by electronic means or U.S. Mail on April 30, 2008.

                                               s/ Alissa Greer
                                               Case Manager to Magistrate
                                               Judge Steven D. Pepe
                                               (734) 741-2298